# In the United States Court of Federal Claims

Nos. 13-0006C, 13-6000C thru 13-6356C (Consolidated)
(Filed: January 18, 2017)

|  |  |  |
|---|---|---|
| PUBLIC HOUSING AUTHORITIES DIRECTORS ASSOCIATION, et al. | )<br>)<br>)<br>) | Keywords: Breach of Contract; United States v. Winstar Corp.; Incorporation by Reference; Funds Subject to Availability; 24 C.F.R. § 990.210(c). |
| Plaintiffs, | )<br>) |  |
| v. | )<br>) |  |
| THE UNITED STATES OF AMERICA, | )<br>) |  |
| Defendant. | )<br>) |  |

*Carl A.S. Coan, III*, Coan & Lyons, Washington, DC, for Plaintiffs. *Raymond K. James*, Coan & Lyons, Of Counsel.

*Eric J. Singley*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Steven J. Gillingham*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN**, **Judge**.

Plaintiffs in these consolidated cases are over three hundred public housing authorities (PHAs) that have entered into Annual Contributions Contracts (ACCs) with the Department of Housing and Urban Development (HUD), as well as two national PHA trade associations. 1st Am. Compl. (Am. Compl.) ¶ 2, ECF No. 8. They allege, among other things, that HUD breached the ACCs in 2012 when it did not comply with the rules set forth at Title 24 of the Code of Federal Regulations that govern the allocation of operating subsidies when funds are not available to pay them in full. Id. ¶¶ 101–05. Plaintiffs request an aggregate amount of $135,836,467 in compensatory damages as well as the costs and expenses of bringing this action. Id. at 60.

Currently pending before the Court are: 1) the government's motion to dismiss the complaints of the two PHA trade associations and sixteen of the individual PHA plaintiffs for lack of standing; and 2) the parties' cross-motions for partial summary judgment as to Count I of the amended complaint. For the reasons set forth below: 1) the government's motion to dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART**; 2) the plaintiffs' motion for partial summary judgment is **GRANTED**; and 3) the government's motion for partial summary judgment is **DENIED**.

# BACKGROUND[1]

## I. Statutory and Regulatory Framework

The federal public housing program, authorized by the United States Housing Act of 1937, 42 U.S.C. §§ 1437–40, exists "to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families" and "to address the shortage of housing affordable to low-income families." 42 U.S.C. § 1437(a)(1).

The federal government does not own, manage, or maintain public housing; rather, the statute vests the responsibility for program administration in public housing authorities, see id. § 1437a(a)(1)(C), defined as "State, county, municipality, or other governmental entit[ies] or public bod[ies] . . . authorized to engage in or assist in the development or operation of public housing," id. § 1437a(b)(6)(A). Pursuant to statute, HUD "may make annual contributions to public housing agencies to assist in achieving and maintaining the lower income character of their projects." Id. § 1437c(a)(1). To that end, Congress has established two sources of funds: (1) the capital fund, which provides funds "to carry out capital and management activities," id. § 1437g(d); and (2) the operating fund, which supplies funding "for the operation and management of public housing," id. § 1437g(e). Plaintiffs' claims in this case involve disbursements from the operating fund.

Congress has specified that HUD must "establish a formula for determining the amount of assistance provided to public housing agencies from the Operating Fund for [each] fiscal year." Id. § 1437g(e)(2)(A). The formula may take into account a number of factors, including, among others, costs of operations; the number of public housing dwelling units owned, assisted, or operated by the public housing agency; and "any other factors that the Secretary determines to be appropriate." Id. § 1437g(e)(2)(A)(i)-(iii), (vii).

HUD has implemented this statutory authority through regulations codified at 24 C.F.R. Part 990. These regulations define an "operating subsidy" as "the amount of annual contributions for operations a PHA receives each funding period under section 9 of the 1937 Act as determined by the Operating Fund Formula." 24 C.F.R. § 990.115. Under the Operating Fund Formula set forth in the regulations, PHAs are eligible for an operating subsidy (or annual contribution) equal to "the difference between formula expense and formula income." Id. § 990.110(a)(2); see also id. § 990.200. Formula income consists of an estimate of a PHA's non-operating-subsidy revenue, which is calculated by dividing the amount of rent charged to tenants by the respective months the

---

[1] The facts set forth in this section are not in dispute and are based on the parties' pleadings and the exhibits that they submitted in support of their cross-motions for summary judgment.

property was leased. Id. § 990.195(a) (2005).[2] Formula expense is an estimate of a PHA's operating expenses, determined by adding together (1) the PHA's project expense level (PEL), which represents the normal expenses of operating public housing projects (such as costs of administration, management, and leasing, see id. at § 990.165(a)); (2) its utility expense level (UEL); and (3) several other formula expenses (or "add-ons"). Id. § 990.110(a)(3).

Further, the regulations contain a provision for adjusting the amount of each PHA's operating subsidy payment in circumstances where Congress fails to appropriate sufficient funds to pay the aggregate amount due to PHAs under the Operating Fund Formula. That provision, 24 C.F.R. § 990.210(c), states that "[i]n the event that insufficient funds are available, HUD shall have discretion to revise, on a pro rata basis, the amounts of operating subsidy to be paid to PHAs." Id.; see also id. § 990.110(b)(3) (stating that the payment of operating subsidies "will be limited to the availability of funds as described in § 990.210(c)").[3]

## II.  The Annual Contributions Contracts

The Housing Act requires that "the provisions for [] annual contributions" made to PHAs be embodied "in a contract guaranteeing their payment." 42 U.S.C. § 1437c(a)(1); see also 24 C.F.R. § 990.115 (defining an ACC as "a contract prescribed by HUD for loans and contributions, which may be in the form of [an] operating subsidy, whereby HUD agrees to provide financial assistance and the PHA agrees to comply with HUD requirements for the development and operation of its public housing projects"). Accordingly, each of the PHA plaintiffs in this case is a party to an ACC with HUD that

---

[2] This regulation was amended in 2016, but the amendment has no effect on the outcome of this case.

[3] This version of 24 C.F.R. § 990.210(c) was issued in 2005. Before 2005, if Congress failed to appropriate sufficient funds to cover the aggregate amount of operating subsidies for which all PHAs were eligible, HUD's regulations gave it "complete discretion to revise, on a pro rata basis or other basis," the amount of operating subsidy to be paid to PHAs. See Allocation of Operating Subsidies Under the Operating Fund Formula, 66 Fed. Reg. 17276, 17297 (Mar. 29, 2001). On May 11, 2005, during the negotiated rulemaking process that is mandated by 42 U.S.C. § 1437g(f), HUD and the stakeholders who were members of the negotiated rulemaking committee reached consensus to cabin HUD's discretion so that its only option in the event of a budget shortfall was to reduce operating subsidies on a prorated basis. See Pls.' Mot. for Summ. J. (Pls.' Mot.) App. at A49–51. HUD incorporated this change into its proposed and final rules. See Revisions to the Public Housing Operating Fund Program, 70 Fed. Reg. 19858, 19871 (Apr. 14, 2005) (proposed rule); Revisions to the Public Housing Operating Fund Program, 70 Fed. Reg. 54984, 55004 (Sept. 19, 2005) (final rule).

3

outlines the terms and conditions pursuant to which they are entitled to receive operating subsidies.[4]

As pertinent to the issues presented in this case, the ACCs between the PHA Plaintiffs and HUD specify that the PHAs shall "develop and operate all projects covered by this ACC in compliance with . . . all applicable statutes, executive orders, and regulations issued by HUD, as they shall be amended from time to time." Pls.' Mot. App. at A65 § 5. In particular, the PHAs agree to comply with "those regulations promulgated by HUD at Title 24 of the Code of Federal Regulations, which are hereby incorporated into this ACC by reference as if fully set forth herein, and as such regulations shall be amended from time to time." Id. The contracts further require HUD to provide annual contributions to the PHAs "in accordance with all applicable statutes, executive orders, regulations, and this ACC." Id. at A64 § 3.

Section 11 of the ACCs sets forth the procedure by which PHAs must prepare their annual budgets and submit their requests for operating subsidies for the upcoming fiscal year. It requires PHAs to "submit a calculation of operating subsidy eligibility in the manner prescribed by HUD in regulations in Title 24 of the Code of Federal Regulations." Id. at A67 § 11. The ACCs provide that "HUD shall review the calculation and, if correct, and subject to the availability of funds, take action within 45 days of submission to obligate the funds and approve a payment schedule," subject to exceptions not relevant here. Id. HUD may also "revise or amend the subsidy calculation to bring it into conformity with regulatory requirements," in which case the PHA "shall submit revised calculations in support of mandatory or other adjustments based on procedures and deadlines prescribed by HUD." Id.

## III.     The 2012 Appropriations Act

Plaintiffs' breach of contract claims in this case arise out of changes to the calculation and allocation of operating subsidies that HUD implemented for 2012 on the basis of the Consolidated and Further Continuing Appropriations Act [of] 2012 (2012 Appropriations Act), Pub. L. 112-55, 125 Stat. 552, 680.

The pertinent provisions of the 2012 Appropriations Act had their genesis in the President's proposed budget for 2012. See Pls.' Mot. App. at A54–55. Thus, the President's proposal (which included a proposed appropriation of $3,961,850,000 to HUD to pay operating subsidies in FY 2012) contained a proviso stating that "in determining [PHAs'] . . . calendar year 2012 funding allocations . . . the Secretary shall take into account PHAs' excess operating reserves, as determined by the Secretary." Id.

---

[4] The current version of the standard ACC was issued by HUD in June 1995. See Dep't of Housing and Urban Dev., Notice PIH 95-44 (June 23, 1995), https://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/notices/pih/95pihnotices. The ACC was written by HUD and its terms were not the subject of negotiation by the PHAs.

4

at A54. According to the proposal, the $3,961,850,000 requested, when "coupled with $1 billion from [PHAs'] operating reserves, will fund 100 percent of PHAs' estimated eligibility for operating subsidies under the Operating Fund formula ($4.962 billion)." Id.[5]

On September 26, 2011, in anticipation of Congress's approval of the President's proposal, HUD issued PIH Notice 2011-055, Public Housing Operating Subsidy Calculations for Calendar Year 2012 (PIH Notice). See Pls.' Mot. App. at A75–78. That Notice provided public housing agencies with "instructions for operating subsidy calculation submissions in Calendar Year (CY) 2012 as funded from Federal Fiscal Year (FFY) 2012 appropriations." Id. at A75.

In the PIH Notice, HUD announced that, consistent with the President's proposal, after it determined the 2012 Operating Fund Formula eligibility for each PHA, it would make an allocation adjustment based on the PHA's excess operating reserves—i.e., the amount of the PHA's operating reserves above a specified "minimum level." Id. at A76. The PIH Notice defined operating reserves to include unspent operating subsidies and tenant rents, based upon four prior financial submissions (June 30, 2010, September 30, 2010, December 31, 2010, and March 31, 2011). Id. at A76–77. And it defined the minimum level of reserves as four months of PHAs' estimated formula operating expenses for most PHAs, and six months of estimated expenses for small PHAs. Id. at A76.

In November 2011, approximately two months after HUD issued the PIH Notice, the 2012 Appropriations Act was enacted. The relevant provision of the Act stated, in pertinent part, that it appropriated $3,961,850,000, "[f]or 2012 payments to public housing agencies for the operation and management of public housing, as authorized by section 9(e) of the United States Housing Act of 1937 . . . [p]rovided, [t]hat in determining public housing agencies' . . . calendar year 2012 funding allocations under this heading, the Secretary shall take into account public housing agencies' excess operating fund reserves, as determined by the Secretary." 125 Stat. at 680 (emphasis in original).

The Act thus adopted the President's proposed budget amount for operating subsidies, as well as his proposal that the Secretary be given the authority to "offset [PHAs'] allocations of operating funds in fiscal year 2012 based on excess reserves they have available to meet their operating needs." See Pls.' Mot. App. at A57–58 (report by the Senate Committee on Appropriations regarding the 2012 Appropriations Act, S. Rep.

---

[5] In the Administration's view, many PHAs were "holding significant operating reserves accumulated primarily from prior-year appropriations for the Operating Fund program." Pls.' Mot. App. at A55. These reserves, according to the explanatory section in the President's proposed budget, "represent cash available to PHAs for operating expenses and other eligible activities under the program." Id. The President thus proposed "to reduce funding allocations to PHAs that have more than sufficient (i.e., excess) operating reserve levels." Id.

No. 112-83 (2011)). In addition, Congress imposed certain restrictions on the amount of the offset, which were not included in the President's proposal, to ensure that no PHA would see its reserves reduced below $100,000. 125 Stat. at 680. It also limited the aggregate amount of reserves that HUD could use as an offset to $750 million, rather than the $1 billion the President had proposed. Id.

HUD's implementation of the authority it was given under the 2012 Appropriations Act changed the methodology used for calculating the amount of operating subsidies to be paid to the PHAs. In prior years, pursuant to its regulations, HUD had reduced each PHA's operating subsidy payment by a uniform percentage that reflected the shortfall between the total amount Congress had appropriated and the total amount payable under the Operating Formula. Because of the changes HUD made to comply with the 2012 Act, however, the reduction of the PHAs' payments to account for the budget shortfall were not made on a pro rata basis.

The process HUD employed to implement the reduction was as follows. First, employing the Operating Formula set forth in its regulations to each PHA, HUD determined that the aggregate formula amount to which the PHAs were entitled was $4,888,046,046. See id. at A17. Then, in accordance with the methodology set forth in the PIH Notice, it determined each PHA's excess operating reserves. The aggregate amount of excess operating reserves so determined was $738,316,329. Id.; see also id. at A77. HUD then subtracted the aggregate amount of the PHAs' excess operating reserves ($738,316,329) from the aggregate Operating Formula amount ($4,888,046,046). Id. at A17. Finally, it took the difference ($4,149,983,999) and compared it to the total amount Congress had appropriated for operating subsidies ($3,961,850,000). Id. It then arrived at the percentage (94.97%) which would be used to adjust the amount of the PHAs' subsidy payments so that HUD would remain within the $3,961,850,000 that Congress had appropriated to pay operating subsidies. Id.

With that analysis complete, HUD went on to determine the operating subsidy payment each individual PHA would receive. As in previous years, the starting point for this determination was each PHA's eligibility amount under the Operating Formula. See Def.'s Mot. to Dismiss and Cross-Mot. for Summ. J. (Def.'s Mot.) App. at 13. But unlike in previous years, HUD then made an "allocation adjustment" by offsetting each individual PHA's excess operating reserves against its Operating Formula eligibility amount. See id. Finally, HUD then multiplied the adjusted amount by 94.97% to determine the payment each PHA would actually receive (thus ensuring that HUD did not exceed the Congressional appropriation). See id.; see also Pls.' Opp'n to Def.'s Mot. to Dismiss and Cross-Mot. for Summ. J. (Pls.' Opp'n) App. at A18–21 (providing examples of the results of these calculations).

Because the amount of excess operating reserves varied from PHA to PHA, so did the percentage reduction in their Operating Formula eligibility amounts. PHAs without excess operating reserves received 94.97% of their formula eligibility amount while, according to Plaintiffs (Pls.' Mot. at 20), many PHAs experienced as much as a 100% reduction in their operating subsidies below the amount derived from application of the Operating Formula.

6

## IV. These Actions

These actions were originally brought in a single complaint filed on behalf of 359 separate plaintiffs on January 3, 2013. ECF No. 1. An amended complaint was filed on March 1, 2013. ECF No. 8. Thereafter, by Order of July 3, 2013, the Court severed the claims of each of the 358 plaintiffs listed on the Amended Complaint after the Public Housing Authorities Directors Association; directed the Clerk to assign separate docket numbers to each claim; directed each plaintiff to pay the court's filing fee; and consolidated the now-severed cases for all purposes pursuant to Rule 42 of the Rules of the Court of Federal Claims (RCFC). ECF No. 15.

In Count I of the amended complaint, Plaintiffs alleged that HUD breached the ACCs in question because, by taking their excess reserves into account when determining their operating subsidy payments, HUD in fact reduced their operating subsidy payments on a non-pro rata basis, in conflict with the Title 24 regulations incorporated into the ACCs. Id. ¶¶ 88–106.[6] Plaintiffs seek compensatory damages in the aggregate amount of at least $135,836,467, as well as an award for the costs and expenses of bringing this action. Id. at 60.

On May 2, 2013, before any discovery had taken place, the government filed a motion for partial summary judgment as to Counts I and III of the amended complaint. ECF No. 10. On August 20, 2013, Judge Allegra, who was then presiding over the case, denied the government's motion for partial summary judgment as premature. See Order Denying Mot. for Partial Summ. J. (Aug. 20, 2013). On December 4, 2015, after a period of discovery, during which the case was transferred to the undersigned, Plaintiffs filed a motion for summary judgment as to Count I of their amended complaint. ECF No. 36. On February 12, 2016, the government in turn filed a cross-motion for summary judgment as to Count I as well as a motion to dismiss certain Plaintiffs whom the government claims lack standing to pursue their claims. ECF No. 41.

Oral argument was held on the cross-motions on July 20, 2016. After argument, the Court requested that the parties file supplemental briefs concerning the proper interpretation and application of § 11(A) of the ACCs, which states that HUD's duty to pay operating subsidies is "subject to the availability of funds." ECF No. 54. Supplemental briefing was completed on December 7, 2016. ECF Nos. 57, 64–65.

---

[6] Counts II and III of the amended complaint are not before the Court on the cross-motions for partial summary judgment. In those Counts, Plaintiffs allege that HUD violated its regulations when, as a basis for reducing their operating subsidy payments, it considered their non-rental income as well as extra income they earned from the rental income incentive HUD provided them for the years 2007 through 2009. See Am. Compl. ¶¶ 107–20.

7

## DISCUSSION

**I.     Jurisdiction**

The Court of Federal Claims has jurisdiction under the Tucker Act to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). Claims for damages arising out of a breach of contract by the United States are squarely within the express terms of the Tucker Act.

The government contends, however, that the Court lacks jurisdiction over the claims of sixteen of the public housing agency plaintiffs, as well as the two PHA trade associations, because they lack standing. Def.'s Mot. to Dismiss at 8–9. Specifically, it argues that these sixteen PHA plaintiffs did not suffer any injury-in-fact because they did not have excess operating reserves and therefore were not subject to the offset about which they complain. Id. at 13. It further contends that because the two association plaintiffs were not parties to any contract with HUD, they also did not suffer any injury-in-fact. Id. at 9.

"Standing is a threshold jurisdictional issue that implicates Article III of the Constitution." First Annapolis Bancorp, Inc. v. United States, 644 F.3d 1367, 1373 (Fed. Cir. 2011) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998)). Although this Court is an Article I court, it applies the same standing requirements as do Article III courts. See Glass v. United States, 258 F.3d 1349, 1355–56 (Fed. Cir.), amended on reh'g, 273 F.3d 1072 (Fed. Cir. 2001). To satisfy those requirements, "a plaintiff must show that (1) it suffered an injury-in-fact that is (2) fairly traceable to the challenged conduct of the defendant and (3) likely redressable by a favorable judicial decision." Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1130 (Fed. Cir. 2008) (citing Figueroa v. United States, 466 F.3d 1023, 1029 (Fed. Cir. 2006)).

Plaintiffs do not dispute that thirteen of the sixteen PHA plaintiffs whose complaints the government seeks to dismiss were not subject to the offset and did not suffer any monetary damages from the alleged breach of the ACCs at issue in these cases.[7] Pls.' Opp'n at 8. Because these thirteen plaintiffs acknowledge that they did not

---

[7] These thirteen plaintiffs are: Housing Authority of the City of Warner Robins (No. 13-6058); Housing Authority of the City of Slidell (No. 13-6115); Brunswick Housing Authority (No. 13-6121); Housing and Redevelopment Authority of Jackson, Minnesota (No. 13-6150); Washington County Housing and Redevelopment Authority (No. 13-6153); Housing Authority of the City of Joplin, Missouri (No. 13-6168); Housing Authority of the City of Raleigh (No. 13-6245); Housing Authority of the City of Greenville (No. 13-6244); Statesville Housing Authority (No. 13-6247); Rahway Housing Authority (No. 13-6214); East Orange Housing Authority (No. 13-6222); Akron

suffer any injury-in-fact as a result of the breach, they lack standing to bring an action for breach of contract and their complaints must be dismissed for lack of jurisdiction.[8]

Further, neither of the two PHA association plaintiffs was itself a party to an ACC. In order to sue the government on a contract claim, a plaintiff must be in privity with the United States. First Annapolis Bancorp, Inc., 644 F.3d at 1373 (citing Anderson v. United States, 344 F.3d 1343, 1351 (Fed. Cir. 2003)). "Not only is privity a fundamental requirement of contract law, but it takes on even greater significance in cases such as this, because the 'government consents to be sued only by those with whom it has privity of contract.'" S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 (Fed. Cir. 2005) (quoting Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984)).

Plaintiffs argue nonetheless that while the two trade associations—the Public Housing Authorities Directors Association (PHADA) and the National Association of Housing and Redevelopment Officials (NAHRO)—may not have standing in their own right under Article III, they may sue on behalf of their members under principles of associational standing. Pls.' Opp'n at 5. They observe that, in fact, 270 of the 355 public housing agency plaintiffs are members of the lead plaintiff, PHADA, and that "[t]he remaining 85 PHA Plaintiffs are either members only of NAHRO or not members of PHADA or NAHRO." Id.

"To establish standing based upon harm to one or more of its members . . . an association must establish '(a) [that] its members would otherwise have standing to sue in their own right; (b) [that] the interests it seeks to protect are germane to the organization's purpose; and (c) [that] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Disabled Am. Veterans v. Gober, 234 F.3d 682, 689 (Fed. Cir. 2000) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)). Leaving aside whether PHADA and NAHRO have met the first two criteria for establishing standing based on harm to their membership, they cannot meet the third prong of the Hunt test because the damages claims of their members require individualized proof. See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 554 (1996) (observing that Warth v. Seldin, 422 U.S. 490 (1975), and other precedents "have been understood to preclude

---

Metropolitan Housing Authority (No. 13-6263); and Chester Housing Authority (No. 13-6284). Def.'s Mot. at 8–9; Pls.' Opp'n at 8.

[8] Three of the plaintiffs challenge the government's assertion that they did not have any excess operating reserves and therefore were not injured by the breach of contract that they allege. Pls.' Opp'n at 8. In its reply brief, the government states that—to the extent that these plaintiffs can establish such damages, it will not contest jurisdiction. Def.'s Reply in Supp. of Def.'s Mot. to Dismiss and Cross-Mot. for Summ. J. (Def.'s Reply) at 2. The Court concludes that given this factual dispute, it would be improper to dismiss these three plaintiffs from the suit on the basis of the government's current motion.

associational standing when an organization seeks damages on behalf of its members"). Accordingly, PHADA and NAHRO lack standing as associations to bring suit on behalf of their members.[9]

Finally, the Court is not persuaded by Plaintiffs' citation of Bowsher v. Synar, 478 U.S. 714, 721 (1986) for the proposition that—given that the standing of the majority of the plaintiffs is clear—it should maintain jurisdiction over the complaints of the plaintiffs who lack standing. Pls.' Opp'n at 6–7. In Bowsher, the Court chose not to address the difficult question of whether members of Congress had standing to challenge the constitutionality of the Balanced Budget Act, because at least one of the other plaintiffs in the case did possess standing. 478 U.S. at 721. The dismissal of the Congressional plaintiffs on standing grounds would have had no practical effect on the Supreme Court's disposition of the case on the merits, and the Supreme Court's decision would mark the end of the litigation. In this case, however, the standing issues are not difficult; indeed, Plaintiffs concede that the thirteen individual plaintiffs lack standing. Moreover, at this stage in the case, it serves the interests of judicial economy and efficiency to dismiss from these consolidated cases those complaints that are not within the Court's jurisdiction.

For these reasons, the government's motion to dismiss Nos. 13-6121, 13-6115, 13-6153, 13-6245, 13-6247, 13-6214, 13-6263, 13-6284, 13-6058, 13-6168, 13-6150, 13-6222, 13-6244, 13-0006, and 13-6000 is **GRANTED**.

## II. Summary Judgment Standards

In accordance with RCFC 56(a), summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The material facts in this case are not in dispute. Further, Plaintiffs' breach of contract claims depend upon the resolution of questions of law—the interpretation of the ACCs and whether HUD breached the ACCs when it took operating reserves into consideration in determining Plaintiffs' operating subsidies. Therefore, Plaintiffs' breach of contract claims are appropriate for resolution by summary judgment. Gov't Sys. Advisors, Inc. v. United States, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988) (observing that

---

[9] The fact that a number of the organizations' members are also plaintiffs in this case does not establish—as Plaintiffs argue—that every member of the organizations that might claim an injury is a party to the suit and therefore can provide the individualized proof required to fashion an award of damages to the organizational plaintiffs on their behalves. See Pls.' Opp'n at 6. And to the extent that the injured members of the organizations are also plaintiffs in the suit as individuals, the participation of the associations as proxies seems, in any event, superfluous.

claims alleging breach of contract that rise or fall with the interpretation of the contract are generally "amenable to decision on summary judgment"); see also Varilease Tech. Grp. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002) (same).

### III.   Merits

Plaintiffs argue that the ACCs incorporated by reference HUD's regulations at Title 24 of the Code of Federal Regulations, including § 990.210(c), which provides that "[i]n the event that insufficient funds are available, HUD shall have discretion to revise, on a pro rata basis, the amounts of operating subsidy to be paid to PHAs." According to Plaintiffs, HUD breached the ACCs in 2012 when, rather than reducing their subsidy payments by a uniform percentage (i.e., on a pro rata basis), it first offset each PHA's payment by a figure that varied from one PHA to another—the amount of its excess operating reserves.

The government's central argument in response is that HUD's methodology was compelled by the requirements of the 2012 Appropriations Act, and that compliance with that Act was required by the ACCs themselves. In addition, the government contends that Plaintiffs' arguments are foreclosed by provisions in the ACCs and HUD's regulations which state that operating subsidy payments are subject to or limited by the availability of funds.

For the reasons set forth below, the Court concludes that Plaintiffs' arguments are the more persuasive ones. Accordingly, Plaintiffs' motion for partial summary judgement is **GRANTED** and the government's cross-motion is **DENIED**.

#### A.   Incorporation of Title 24 Regulations, as Amended, into the ACCs

It is well established that "[t]o incorporate material by reference, a contract must use clear and express language of incorporation, which unambiguously communicates that the purpose is to incorporate the referenced material, rather than merely acknowledge that the referenced material is relevant to the contract." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 826 (Fed. Cir. 2010); see also Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1344 (Fed. Cir. 2008) (observing that "the incorporating contract must use language that is express and clear, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated" (emphasis in original)). The Court of Appeals "has been reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." Northrop Grumman Info. Tech., 535 F.3d at 1344 (quoting St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1384 (Fed. Cir. 2008) (emphasis in original)).

In this case, the ACCs contain language expressly incorporating HUD's regulations at Title 24 into the contracts. Thus, section 5 of the ACCs specifies that the parties must comply with the regulations "promulgated by HUD at Title 24 of the Code of Federal Regulations, which are hereby incorporated into this ACC by reference as if

11

fully set forth herein, and as such regulations shall be amended from time to time." Pls.' Mot. App. at A65 (emphasis supplied). This language "unambiguously communicates that the purpose" of section 5 "is to incorporate the referenced material," i.e., Title 24, including any amendments made to Title 24 after the contracts' executions. See Precision Pine, 596 F.3d at 826; see also S. Cal. Edison Co. v. United States, 226 F.3d 1349, 1353 (Fed. Cir. 2000) (holding that the contracts at issue incorporated the terms and conditions of certain regulations by specifically referring to the regulations (the text of which was attached to the contract as an exhibit) as being part of the contract "as fully and completely as though set forth herein [i.e., in the contract] in length").

Further, the intent to incorporate the provisions of Title 24 (as they may be amended from time to time) into the contracts is also reflected in the preamble to the ACCs. It states that each ACC "incorporates by reference into this ACC those regulations issued by HUD for the development, modernization, and operation of public and Indian housing projects contained in Title 24 of the Code of Federal Regulations, as said Title shall be amended from time to time." Pls.' Mot. App. at A63.

These express statements of intent that HUD's Title 24 regulations, as amended, are incorporated into the contract, are sufficient to establish that the parties undertook a contractual obligation to comply with the terms of those regulations. Indeed, the government does not argue otherwise. The Court turns, therefore, to the question of whether HUD violated that contractual obligation in its allocation of operating subsidies to Plaintiffs in 2012.

### B. Breach of Contract Claims

#### 1. HUD's Contractual Commitment

It is well established that the "rights and duties" contained in a Government contract "are governed generally by the law applicable to contracts between private individuals." United States v. Winstar Corp., 518 U.S. 839, 912 (1996) (quoting Lynch v. United States, 292 U.S. 571, 579 (1934)); see also Mobil Oil Expl. & Producing Se., Inc. v. United States, 530 U.S. 604, 607–08 (2000). Further, a breach of the government's contractual obligations may be effected through legislation that requires the government to take actions that are inconsistent "with the promises that . . . earlier contracts contain[]." Mobil Oil, 530 U.S. at 624. In such instances, where a subsequent statute makes the government unable to fulfill its contractual promises, it may be liable to pay damages for breach of contract. See Winstar, 518 U.S. at 870.

Notwithstanding the foregoing, the government argues that the principles set forth in Winstar and Mobil Oil do not apply to Plaintiffs' claims. It contends that —unlike the plaintiffs in those cases—the PHAs did not bargain for the right they claim here, which the government characterizes as the right to have their 2012 formula subsidies reduced on a pro rata basis. Indeed, the government notes, "the claimed right is based entirely upon a 2005 language change in the Title 24 regulations, which occurred ten years after the contracts were written and signed." Def.'s Reply at 5 (emphasis in original).

12

The government's arguments miss the mark. The government is correct that the PHAs did not bargain for the right to have HUD employ a particular methodology for determining their operating subsidy payments in the event of a budget shortfall. But they did bargain for the right to require HUD to use whatever methodology was set forth in the regulations at Title 24 of the C.F.R., as amended from time to time. And the content of those regulations would be determined with their participation and input, through the negotiated rulemaking process.[10] Indeed, the record shows that it was upon the initiative of public housing stakeholders on the rulemaking committee that the regulation upon which Plaintiffs rely in this case was amended in 2005 to preclude HUD from reducing operating subsidy payments on anything other than a pro rata basis in the event of insufficient appropriations. Because Plaintiffs argue that the 2012 Act deprived them of their important contractual right to have their operating subsidy payments determined consistent with the applicable provisions of Title 24, their claims fall squarely within the rationale of Winstar and Mobil Oil.

### 2. The Alleged Breach

As described in greater detail above, HUD's regulations provide that a PHA is entitled to an operating subsidy determined on the basis of a specified Operating Fund Formula, and that, in the event that "insufficient funds are available," "amounts of [the] operating subsidy to be paid" shall be revised "on a pro rata basis." 24 C.F.R. § 990.210(c). In 2012, HUD did not revise the amounts to be paid to each PHA under the Operating Formula on a pro rata basis—i.e., by a uniform percentage. Instead, it made an initial reduction in each Plaintiff's subsidy by offsetting that particular PHA's "excess operating reserves" against its formula eligibility amount. Thus, the PHAs' formula eligibility amounts were reduced on a non-pro rata basis, contrary to the provisions of Title 24. It was only after that offset was applied that HUD applied a uniform percentage (94.97%) to make a second reduction.[11]

---

[10] Congress mandated that HUD employ the negotiated rulemaking procedures set forth at 5 U.S.C. §§ 561–70a when issuing regulations concerning the operating subsidy formula. See 42 U.S.C. § 1437g(f). Those procedures provide for collaboration and greater stakeholder participation in the rulemaking process than exists under the traditional notice-and-comment procedures prescribed in the Administrative Procedure Act. In a negotiated rulemaking, a committee consisting of stakeholders and agency representatives meets publicly to negotiate the content of new regulations before they are issued in proposed form. See 5 U.S.C. §§ 565–66. Because of the enhanced opportunities for stakeholder input, "[p]roponents of negotiated rulemaking claim that these procedures—which encourage affected parties to reach an agreement at the outset—will decrease the amount of time it takes to develop regulations and, more notably, reduce or eliminate subsequent judicial challenges." Cary Coglianese, Assessing Consensus: The Promise and Performance of Negotiated Rulemaking, 46 Duke L.J. 1255, 1257 (1997).

[11] The Court notes that 24 C.F.R. § 990.110(c) states that "this part does not codify certain secondary elements that will be used in the revised Operating Fund Formula," and

Notwithstanding the foregoing, the government contends that HUD's failure to comply with Title 24 did not constitute a breach of contract because the ACCs contemplated that their terms were subject to both existing and future applicable laws, including the 2012 Appropriations Act. See Def.'s Mot. at 14–16. This argument is unpersuasive.

First, the government's argument collides with the principles, set forth above, which demand "clear and express language of incorporation" to make material outside the contract a part of the contract. Precision Pine, 596 F.3d at 826. The ACCs contain no express statement of intent to incorporate by reference into the contract any statutory provisions that might be enacted in the future, or even any statute in existence at the time of the contracts' executions. See id.

For example, the preamble to the ACC (upon which the government relies) does not even reference the government's obligations, nor does it contain express language of incorporation. It merely states that "[n]othing herein shall release the HA [Housing Authority] from compliance with all applicable laws, executive orders, and regulations that are not specifically incorporated herein by reference." Pls.' Mot. App. at A63. Similarly, while section 3 of the ACC at least refers to HUD's obligations, it simply recites a truism, stating that "HUD shall provide annual contributions to the HA in accordance with all applicable statutes, executive orders, regulations, and this ACC." See id. at A64.

The relevant precedent confirms that contract language stating that a party's obligations shall be governed by or subject to "applicable statutes" is not sufficient to evince the incorporation of any particular statute into the contract by reference (either as then in existence or as might be subsequently enacted). See Mobil Oil, 530 U.S. at 615–16 (lease contracts stating that they were subject to specific statutory provisions and regulations, as well as "all other applicable statutes and regulations," incorporated specific statutes and regulations existing at the time of the contract's formation and referenced therein, but not other subsequently enacted statutes and regulations); Smithson v. United States, 847 F.2d 791, 794 (Fed. Cir. 1988) (rejecting plaintiff's argument that entire body of regulations promulgated by the Farmers Home Administration was

---

that "HUD will more appropriately provide this information in non-codified guidance such as a Handbook, Federal Register notice, or other non-regulatory means that HUD determines appropriate." Although the government referenced this provision in its opening brief, see Def.'s Mot. at 3–4, it has never argued that consideration of a PHA's excess operating reserves in determining its subsidy could be characterized as the use of a "secondary element" in the Operating Fund Formula. Nor could it. As HUD explained in the preamble to its regulations, this language was intended to refer to situations in which "HUD has determined that clarification of existing regulatory requirements is needed" and so "will issue such guidance through non-regulatory means." Revisions to the Public Housing Operating Fund Program, 70 Fed. Reg. 54984, 54989 (Sept. 19, 2005). Imposing an excess operating reserve offset was a new regulatory requirement, not a clarification of existing ones.

incorporated by reference into plaintiff's contract, based on a provision stating that the contract was "subject to" such regulations, noting among other things that "if that were the parties' purpose, they would have explicitly so provided"); Earman v. United States, 114 Fed. Cl. 81, 103–04 (2013) (provision stating that the contract "shall be carried out in accordance with all applicable Federal statutes and regulations" "does not refer to any particular statutory or regulatory provision," and therefore "cannot reasonably be read as incorporating the entire corpus of the [relevant] statute into plaintiff's contract"), aff'd, 589 F. App'x 991 (Fed. Cir. 2015).

Further, it is illuminating to compare the language that the ACCs employ when describing the relationship between the Title 24 regulations and the contract to the language the ACCs use when referencing either statutes or other potentially applicable regulations. Thus, in the very same sentence of § 5 stating that "[t]he HA shall develop and operate all projects covered by this ACC in compliance with all the provisions of this ACC and all applicable statutes, executive orders, and regulations issued by HUD, as they shall be amended from time to time," the ACCs explicitly and specifically "incorporate[] . . . by reference as if fully set forth herein" only "those regulations promulgated by HUD at Title 24 of the Code of Federal Regulations. . . as such regulations shall be amended from time to time." Pls.' Mot. App. at A65. This demonstrates that where the ACC was intended to incorporate external legal requirements (as with the Title 24 regulations), the contract employs the kind of express language of incorporation that Precision Pine and Northrop Grumman require. By contrast, the ACCs do not use the language of incorporation in reference to any statutes (whether then-existing or subsequently enacted), which further supports the conclusion that the 2012 Act is not incorporated by reference into the ACC.

Nor does the language in § 11 of the ACC stating that "HUD may revise or amend the subsidy calculation to bring it into conformity with regulatory requirements" assist the government's argument. See id. at A67. First, the language refers to "regulatory" requirements, not statutory requirements. And the government does not argue that the PIH Notice contains "regulatory requirements"; nor could it, as such Notices are not promulgated in accordance with the negotiated rulemaking procedures required by the statute.

Further, and in any event, the "regulatory requirements" to which § 11 refers are those set forth in Title 24. Thus, the language appears within a clause that lays out the administrative process by which HUD will determine a PHA's annual operating subsidy eligibility. See id. It requires the PHA to submit to HUD an annual "calculation of operating subsidy eligibility in the manner prescribed by HUD in regulations in Title 24 of the Code of Federal Regulations." Id. It then specifies that HUD will review the submission and that, if it is not in conformity with the regulations, HUD may "revise or amend" it. Id. Read in context, it is unreasonable to construe the reference to the revision or amendment of a subsidy eligibility calculation "to bring it into conformity with regulatory requirements" as reflecting anything other than a description of the actions HUD may take in response to a submission that does not comply with Title 24.

In short, the government's argument that compliance with the 2012 Act was itself a contractual obligation lacks merit. The Court turns therefore to the government's final argument—that Plaintiffs' breach of contract claims are foreclosed by provisions in the ACCs and HUD's regulations that make the PHAs' entitlements to operating subsidies "subject to" or "limited by" the availability of funds.

### 3. Availability of Funds

The government's final argument is that language at 24 C.F.R. § 990.110(b)(3), which states that "[o]perating subsidy payments will be limited to the availability of funds as described in § 990.210(c)," "serves as an independent bar to plaintiffs' claims because it limits the Government's liability to the amount appropriated by Congress." Def.'s Reply at 7. This argument lacks merit because it ignores § 990.110(b)(3)'s cross-reference to § 990.210(c), which "describe[s]" how the payments will be limited in the event of a shortfall in appropriations. Section 990.210(c)—stating that "[i]n the event that insufficient funds are available, HUD shall have discretion to revise, on a pro rata basis, the amounts of operating subsidy to be paid to PHAs"—is the very provision Plaintiffs seek to enforce in this case. Plaintiffs do not seek an award of subsidies in excess of the amount appropriated by Congress for such subsidies. Instead, their claims concern the methodology for allocating the amounts Congress has appropriated.

For similar reasons, the Court also rejects the government's reliance upon § 11(A) of the ACCs, which states that HUD "shall review [the PHA's calculation of operating subsidy eligibility under Title 24] and, if correct, and subject to the availability of funds," take action within 45 days to obligate the funds and approve a payment schedule. As the Supreme Court explained in <u>Cherokee Nation of Oklahoma v. Leavitt</u>, 543 U.S. 631 (2005), language stating that the government's provision of funds is "subject to the availability of appropriations" "is often used with respect to Government contracts." <u>Id.</u> at 643 (citations omitted). "This kind of language normally makes clear that an agency and a contracting party can negotiate a contract prior to the beginning of a fiscal year but that the contract will not become binding unless and until Congress appropriates funds for that year." <u>Id.</u> "It also makes clear that a Government contracting officer lacks any special statutory authority needed to bind the Government without regard to the availability of appropriations." <u>Id.</u> (citations omitted).

Further, "[w]hether appropriated funds are legally available for something depends on three things: 1) the purpose of the obligation or expenditure must be authorized; 2) the obligation must occur within the time limits applicable to the appropriation; and 3) the obligation and expenditure must be within the amounts Congress has established." U.S. Gov't Accountability Off., GAO-04-261SP, <u>GAO General Principles of Federal Appropriations Law—Vol. I</u>, ch. 4, 4-6 (3d ed. 2004). In this case, under the 2012 Appropriations Act, funds were available for the purpose of providing subsidies to PHAs for the operation and management of public housing. Further, the obligation to pay Plaintiffs' operating subsidies was within the time limits of the Act (FY 2012). And compliance with Title 24's rules for allocating operating subsidies did not require HUD to spend more than $3,961,850,000, the amount Congress had established. Accordingly, inclusion of the standard proviso in the ACCs, making

16

payment of operating subsidies "subject to the availability of funds" does not preclude Plaintiffs from claiming their contractual right to have those funds allocated consistent with the requirements of Title 24.

* * * * * * * * * * *

In short, the language of the ACCs reflects an intent to incorporate by reference into the contract the provisions of Title 24 of the C.F.R., but no intent to incorporate by reference future statutory provisions like the 2012 Appropriations Act. Further, the language in the regulations (and in the ACCs) that makes the government's obligation to pay operating subsidies "subject to the availability of funds" does not excuse HUD's failure to apply the methodology set forth in the regulations for determining the amount of the operating subsidy payments based on the availability of funds. Therefore, the Court concludes that the government breached its obligations under the ACCs when it applied the operating expense offset in response to the 2012 Appropriations Act, rather than the pro rata reduction rule prescribed by Title 24.[12]

## CONCLUSION

For the foregoing reasons:

1) The government's motion to dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART**;

2) Nos. 13-6121, 13-6115, 13-6153, 13-6245, 13-6247, 13-6214, 13-6263, 13-6284, 13-6058, 13-6168, 13-6150, 13-6222, 13-6244, 13-0006, and 13-6000 are **DISMISSED** without prejudice;

3) Plaintiffs' motion for partial summary judgment is **GRANTED**; and

4) The government's motion for partial summary judgment is **DENIED**.

The Clerk is directed to enter judgment accordingly in Nos. 13-6121, 13-6115, 13-6153, 13-6245, 13-6247, 13-6214, 13-6263, 13-6284, 13-6058, 13-6168, 13-6150, 13-

---

[12] The government's motion for partial summary judgment includes a brief argument that it is entitled to summary judgment on the ground that Plaintiffs' damages claims are "inherently speculative" because they "appear[] to be based upon its belief that Congress would have appropriated the same amount of operating subsidy funds in fiscal year 2012 even without the direction to the Secretary to take into account PHAs['] excess operating reserves." Def.'s Mot. at 16 (citing San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed Cir. 1997)). This contention is unpersuasive. Plaintiffs' claims are not based on speculation about how much money Congress would have appropriated had it not decided to require HUD to consider the PHAs' excess operating reserves. Their claims are based on HUD's failure to follow its Title 24 regulations (which were incorporated into their contracts) in allocating the $3,961,850,000 that Congress in fact did appropriate.

17

6222, 13-6244, 13-0006, and 13-6000. Further, the Clerk is directed to make No. 13-6040, <u>Clearwater Housing Authority v. United States</u>, the lead case in this consolidated action. The parties shall amend the captions of all future filings accordingly.

The parties shall file a joint status report within 30 days, proposing a schedule to govern further proceedings in these cases.

**IT IS SO ORDERED.**

<u>s/ Elaine D. Kaplan</u>
ELAINE D. KAPLAN
Judge